UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | | |
|---|---|---|---|
| LARRY PAYNE, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No.: | 3:25-CV-298-DCLC-JEM |
| | ) | | |
| KIM WHITE, CHRIS UNDERWOOD, | ) | | |
| TANNER RHEAL, OPPY ANDERSON, | ) | | |
| RUST CORNETT, PATRICK TURNER, | ) | | |
| MICHELLE BREWER, TRACINA | ) | | |
| CROSS, and CENTURION MEDICAL | ) | | |
| PROVIDER, | ) | | |
| | ) | | |
| Defendants. | ) | | |

## MEMORANDUM AND ORDER

Plaintiff Larry Payne, a prisoner in the custody of the Tennessee Department of Correction ("TDOC") who is housed at the Bledsoe County Correctional Complex ("BCCX"), filed a (1) pro se prisoner complaint under 42 U.S.C. § 1983 [Doc. 2] and (2) motion for leave to proceed *in forma pauperis* [Doc. 1]. For the reasons set forth below, the Court will grant Plaintiff's motion; permit certain Eighth Amendment claims to proceed against Defendants Cornett, Turner, Brewer, Cross, and Centurion; and dismiss all remaining claims and Defendants.

I. **MOTION TO PROCEED *IN FORMA PAUPERIS***

Under the Prison Litigation Reform Act ("PLRA"), a prisoner bringing a civil action may apply for permission to file suit without prepaying the filing fee. *See* 28 U.S.C. § 1915(a). A review of Plaintiff's motion [Doc. 1] demonstrates that he lacks sufficient financial resources to pay the filing fee in a lump sum. Accordingly, pursuant to 28 U.S.C. § 1915, Plaintiff's motion [*Id.*] will be **GRANTED**.

Plaintiff will be **ASSESSED** the civil filing fee of $350.00. The custodian of Plaintiff's inmate trust account will be **DIRECTED** to submit to the Clerk, U.S. District Court, 800 Market Street, Suite 130, Knoxville, Tennessee, 37902 twenty percent (20%) of Plaintiff's preceding monthly income (or income credited to Plaintiff's trust account for the preceding month), but only when such monthly income exceeds ten dollars ($10.00), until the full filing fee of three hundred fifty dollars ($350.00) as authorized under 28 U.S.C. § 1914(a) has been paid to the Clerk. 28 U.S.C. § 1915(b)(2).

The Clerk will be **DIRECTED** to send a copy of this Order to the Court's financial deputy and the custodian of inmate trust accounts at Plaintiff's current facility to ensure compliance with the PLRA's requirements for payment of the filing fee.

II.     **COMPLAINT SCREENING**

       A.     **Screening Standard**

Under the PLRA, district courts must screen prisoner complaints and *sua sponte* dismiss any claims that are "frivolous, malicious, or fail[] to state a claim upon which relief may be granted," or "seek[] monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also* 28 U.S.C. § 1915(e)(2)(B); *Benson v. O'Brian*, 179 F.3d 1014 (6th Cir. 1999). The dismissal standard articulated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) "governs dismissals for failure to state a claim under [28 U.S.C. §§ 1915(e)(2)(B) and 1915A] because the relevant statutory language tracks the language in Rule 12(b)(6)" of the Federal Rules of Civil Procedure. *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (citations omitted). Thus, to survive an initial review under the PLRA, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Courts should liberally construe pro se pleadings filed in civil rights cases and hold them to a less stringent standard than "formal pleadings drafted by lawyers[.]" *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Even so, allegations that give rise to a mere possibility that a plaintiff might later establish undisclosed facts supporting recovery are not well-pled and do not state a plausible claim. *Twombly*, 550 U.S. at 555, 570. Further, formulaic and conclusory recitations of the elements of a claim which are not supported by specific facts are insufficient to state a plausible claim for relief. *Iqbal*, 556 U.S. at 681.

To state a claim against any Defendant for relief under 42 U.S.C. § 1983, Plaintiff must establish that a "person" acting "under color of" state law deprived him of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983.

### B. Plaintiff's Relevant Allegations[1]

Plaintiff has been diagnosed with "schizophrenia affective disorder" and Bipolar 1 disorder [Doc. 2, p. 19–20]. Plaintiff has attempted suicide six times since 2020 [*Id.* at 20]. Following a suicide attempt at Putnam County in 2021, Plaintiff was hospitalized before being sent to BCCX [*Id.*]. At BCCX, Plaintiff was placed on suicide watch for two weeks before being placed in the Supportive Living Unit ("SLU"), a mental health unit at BCCX [*Id.*]. While there, Plaintiff received various therapies and support, he took his medications as prescribed, and he did not have any disciplinary infractions or suicide attempts [*Id.*]. But in July 2022, Plaintiff was moved to general population in BCCX Site 2, and "shortly thereafter he started having problems" [*Id.*].

#### 1. Protective Custody Review Board

In September 2024, Internal Affairs ("IA") Dykes told Plaintiff that there was a threat on

---

[1] Plaintiff also describes grievances he wrote concerning the events recounted in this lawsuit [*See generally* Doc. 2], but the Court has omitted a recitation of the details of those grievances, as they are immaterial to whether Plaintiff's claims survive PLRA screening.

3

Plaintiff's life [*Id.* at 13]. In October 2024, Plaintiff was assaulted by an inmate [*Id.*]. On October 3, 2024, Plaintiff was placed in segregation "on pending protective custody status" [*Id.*]. On November 4, 2024, Plaintiff had a protective custody ("PC") hearing before PC review board members Kim White, Chris Underwood, Tanner Rheal, and Oppy Anderson ("PC Board"), where he was denied PC despite informing the board members of the threat on his life and subsequent assault [*Id.* at 14]. Plaintiff was told that "being assaulted is not enough" for PC placement and to protect himself [*Id.*]. Plaintiff was returned to general population on November 6, 2024, and he remained there until November 9, when he was placed in segregation pending PC status [*Id.* at 15].

Plaintiff remained on pending PC status until his hearing before the PC review board members on January 21, 2025 [*Id.*]. Plaintiff was again denied PC, despite telling the members that there was a "kill on sight" order issued against him [*Id.*]. The members again advised Plaintiff that they would not place an inmate on PC without a serious injury, and that he needed to protect himself [*Id.* at 15–16]. On January 29, 2025, "Plaintiff was scheduled to be kicked out of segregation and return[ed] to his housing unit[,] but instead Plaintiff attempted suicide by taking a[]lot of his psychiatric med[ication]s" [*Id.* at 16]. As a result of the attempt, Plaintiff suffered "chest pain, sever[e] headaches, and blur[red] vision" for which he received Tylenol and referral to a physician [*Id.*]. Plaintiff was also "placed on close suicide watch" [*Id.*].

Plaintiff was taken off suicide watch on February 11, 2025, and was subsequently placed in segregation on pending PC status [*Id.* at 17]. Plaintiff had a PC hearing before the PC Board where he was again denied PC [*Id.*]. Plaintiff told the members, "Y'all must want me to get stabbed to death, y'all keep denying me PC[.] [Y]'all are 'part of' the reason why I tried to kill myself[.] I have a right for protection[,] and it is your duty to provide me with protection" [*Id.*]. But the board members again denied Plaintiff PC and indicated their indifference to Plaintiff's fear by stating, for example, that "being stabbed is still not a good enough reason to get my vote for

4

PC"; "I do not have to give you PC, and you do not need PC, you need a psychiatric evaluation and mental health care"; "It is not my duty to protect you. You are a grown ass man[.] I suggest you get yourself a knife[,] too"; and "If you get stabbed to death or if you would have succeed[ed] with your suicide attempt[,] then you w[ould] not need protective custody" [*Id.* at 18–19].

On February 19, 2025, Plaintiff appealed to Warden Cobble, and Plaintiff's mother called Warden Cobble about Plaintiff's mental health and the threat on his life [*Id.* at 19]. As a result, on February 21, 2025, Warden Cobble overturned the PC Board's decision and Plaintiff was placed on PC [*Id.*]. On February 27, 2025, Plaintiff appealed to the Assistant Commissioner, who "concurred with [the] Warden" [*Id.*].

### 2. Mental Health Treatment Team

Rust Cornett, Michael Brewer, Patrick Turner, and Tracina Cross are all members of a mental health treatment team ("Mental Health Treatment Team") [*Id.* at 21]. On January 21, 2025, Plaintiff wrote the Mental Health Treatment Team letters advising each that (1) he hears voices; (2) the voices tell him to kill himself; (3) he sees his dead daughter; (4) he sees a demon named Abigil; (5) he does what the voices tell him to do; (6) he is "very paranoid and depress[ed]"; (7) his medications are not helping and need adjusting; (8) he needs "psychiatric and mental health care"; and (9) he requests a transfer to the Lois DeBerry Special Needs Facility, where he could enter the SLU program [*Id.* at 20–21].

On January 28, 2025, Plaintiff told Rust Cornett "about problems that he is having[,]" and Mr. Cornett told Plaintiff that bringing up Plaintiff's issue to the Mental Health Treatment Team would be a waste of time, as Plaintiff's level of care would not be raised and he would not be able to return to the SLU program [*Id.* at 21]. Plaintiff told Mr. Cornett of his suicidal thoughts and his despair that no one will help him, to which Mr. Cornett replied, "Make sure you do it right[,] because either way you still will not get what you want" [*Id.* at 22]. Plaintiff attempted suicide the

next day by ingesting "a large amount of his psychiatric meds" and was placed "on close suicide watch" [*Id.*]. Plaintiff against experienced chest pain, headaches, and blurred vision, for which he was prescribed Tylenol and referred to a physician [*Id.*].

On January 31, 2025, Michelle Brewer told Plaintiff that she read his letter in the treatment team's meeting, "And the answer is no, you need to deal with your own problems and stop trying to become a problem for us[.] I do not care about you trying to kill yourself. All I am going to do is keep putting you on suicide watch for a couple of weeks[,] and if you are serious about your next suicide attempts[,] I can increase your meds so the next time you do it, it will work" [*Id.* at 22–23]. Plaintiff was taken off suicide watch on February 11, 2025 [*Id.* at 23].

Plaintiff wrote the Mental Health Treatment Team additional letters about his mental health on February 17 and March 3 [*Id.* at 23]. On March 19, 2025, Plaintiff had a "seg (segregation check)" and was seen by Michelle Brewer [*Id.*]. Ms. Brewer again voiced that Plaintiff was wasting everyone's time, that he would not get SLU placement or a transfer, that he would not get a psychiatric evaluation, and that she would "not loose any sleep about it one way or the other" if he decided to kill himself [*Id.* at 23–24].

Plaintiff wrote each member of the team another letter on March 24, 2025 [*Id.* at 24]. On April 6, 2025, Plaintiff "signed up for sick call to speak to mental health about his mental health problems" [*Id.*]. Plaintiff was seen by a nurse on April 7, 2025, who referred Plaintiff to Dr. Williams, a psychologist [*Id.*]. After Plaintiff told Dr. Williams of the problems he was having getting mental health care, Dr. Williams stated, "She is the new buddy. All she can do is bring your issues to the treatment team" [*Id.*].

On April 9, 2025, Mr. Cornett "saw the Plaintiff for a seg check" [*Id.* at 24]. Plaintiff told Mr. Cornett that he was hearing voices and "feeling suicidal" [*Id.*]. Mr. Cornett told Plaintiff he would not place him on suicide watch and advised him to stop talking about feeling suicidal, as it

6

was "the only way to stop hearing the voices and seeing things" [*Id.* at 25]. Then on April 30, 2025, Patrick Turner told Plaintiff to "stop with the letters" and "I don't care if you commit suicide, you will be one less inmate we have to deal with" [*Id.*]. Finally, Tracina Cross "disregarded several phone calls/messages from Plaintiff's family about his mental health and did not respond to any of Plaintiff's letters" [*Id.*].

### 3. "Denial of Decent Prison Conditions"

As recounted above, Plaintiff wrote several letters to Mental Health Treatment Team about placing him in the SLU and raising his level of care, which would allow him to receive various therapies, "spiritual support, and security" [*Id.* at 26–27]. Plaintiff did so to no avail. When Plaintiff requested a transfer from Ms. Cross on June 4, 2025, she told Plaintiff, "You will not be transferred and you will not be placed in the SLU program, and if you try to commit suicide, you will be placed on suicide watch[.] [O]r you can get lucky the next time you try to kill yourself" [*Id.* at 28]. Plaintiff told Ms. Cross that his condition was worsening to the point he wanted to die [*Id.*]. In response, Ms. Cross stated that team members would follow the policy of Centurion, the medical provider for TDOC inmates, which only required inmates to be seen once every 90 days [*Id.* at 28, 29]. Plaintiff attempted suicide the next day, June 5, by taking an overdose of his psychiatric medications [*Id.* at 29]. He was provided medical attention and placed on suicide watch [*Id.*]. On June 6, Ms. Cross "authorized for Plaintiff to be tak[en] off suicide observation" [*Id.*].

### 4. Identification of Parties, Claims, and Relief Sought

Plaintiff still suffers from severe headaches and heart pain, and he has not received adequate psychiatric care [*Id.* at 29–30]. Without such care, "Plaintiff is determine[d] to commit suicide, [as] he admits that the voices tell[] him what to do, and he has no control" [*Id.* at 30]. Aggrieved by these circumstances, Plaintiff filed the instant suit against (1) each member of the PC Board in their individual capacities, for their alleged failure to protect him despite knowledge

7

Case 3:25-cv-00298-DCLC-JEM    Document 5    Filed 06/30/25    Page 7 of 12    PageID #: 56

that he faced a serious risk of harm [*Id.* at 6–8, 19, 31]; (2) each member of the Mental Health Treatment Team in their individual and official capacities for their alleged continuing denial of care and failure to protect Plaintiff from self-inflicted injuries [*Id.* at 8–10, 26, 31–32]; (3) Centurion for its alleged deliberate indifference in implementing a "90-day" policy that purportedly delayed Plaintiff's necessary psychiatric care and resulted in injuries [*Id.* at 32]; and (4) Centurion and the Mental Health Treatment Team for their alleged "deliberate indifference to the Plaintiff's right to decent prison conditions by denying the Plaintiff mental health rehabilitative programs" [*Id.* at 32–33]. Plaintiff seeks a variety of injunctive, declaratory, and monetary relief [*Id.* at 34–36].

### C. Analysis

As a prisoner, Plaintiff is protected by the Eighth Amendment's prohibition against the infliction of "cruel and unusual punishments[.]" U.S. Const. amend. VIII. That prohibition "imposes duties" on prison officials. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Those duties require officials to "ensure that inmates receive adequate. . . medical care, and [] take reasonable measures to guarantee the safety of" inmates. *Id*. (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). But only acts or omissions that produce an "unnecessary and wanton infliction of pain" implicate the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). Therefore, to demonstrate a violation of one's right to safety or medical care, a plaintiff must show a "sufficiently serious" need to which the Defendants responded with "deliberate indifference." *Farmer*, 511 U.S. at 834, 842. Acting with "deliberate indifference" means that a prison official "was subjectively aware of the risk and fail[ed] to take reasonable measures to abate it." *Reedy v. West*, 988 F.3d 907, 912 (6th Cir. 2021) (citations and internal quotation marks omitted) (alteration in original). Negligence is insufficient to establish liability. *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839–40).

8

First, Plaintiff complains that the PC Board members denied him PC three times, despite knowing that he would be harmed in general population [Doc. 2 p. 19]. He also alleges that the Mental Health Treatment Team knowingly disregarded his risk of self-harm [*Id.* at 31–32].

As to the PC Board, the Court notes that Plaintiff alleges that he was attacked before the PC Board first considered his request for protective custody. Therefore, Plaintiff did not suffer any injury as a result of their decision to deny Plaintiff PC custody, and his allegations fail to state a claim against them for their alleged failure to protect him from harm. *Branham v. Grinage*, 869 F.2d 1488, 1989 WL 11070, at *1 (6th Cir. 1989) (holding where a plaintiff "fail[s] to state that he actually suffered any harm from the alleged failure to protect him[,]" dismissal of the claim is appropriate because "[a] § 1983 claim only occurs when the threats or threatened conduct results in a constitutional deprivation" (citing *Macko v. Byron*, 760 F.2d 95, 97 (6th Cir. 1985))).

And although he does not expressly raise a claim that the PC Board failed to protect him from self-harm prior to his January 29, 2025, suicide attempt, the Court, out of an abundance of caution, finds Plaintiff's allegations likewise fail to state a claim against the PC Board members for such an alleged failure. Suicidal ideations and tendencies are undoubtedly serious needs for the purposes of a constitutional analysis. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). But deliberate indifference in an attempted suicide case requires "a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded that risk." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (citations omitted). And here, Plaintiff has not alleged any facts that would permit the inference that any of the PC Board members were aware that Plaintiff was at risk of committing suicide prior to January 29, 2025. His requests for PC had, up to that point, only referenced his generalized fear of being hurt in general population. And shortly after his suicide attempt, the Warden placed Plaintiff on PC [*Id.* at 19]. Plaintiff does not allege that he went back before the PC Board after he was placed

9

on PC by the Warden, and therefore, he has not alleged facts that would permit a plausible inference that a PC Board member's actions contributed to his second act of self-harm.[2] Accordingly, Plaintiff has failed to state a plausible § 1983 claim against any of the PC Board members for failing to protect Plaintiff, and these Defendants will be **DISMISSED**.

The Court reaches a different result, however, regarding the Mental Health Treatment Team. Plaintiff alleges facts that permit the plausible inference that each team member knew, and disregarded, Plaintiff's suicidal ideations and tendencies, which did, in fact, result in suicide attempts. Therefore, Plaintiff's failure-to-protect claim will **PROCEED** against the Mental Health Treatment Team members.

Second, the Court finds that the same allegations that permit the plausible inference that the Mental Health Treatment Team failed to protect Plaintiff also permit the plausible inference that they were deliberately indifferent to his psychiatric needs. *See Comstock*, 273 F.3d at 702 (noting the clearly established right to be free from deliberate indifference to medical needs extends to psychiatric needs). Plaintiff's allegations also permit the plausible inference that his psychiatric needs went unmet due to a policy of Centurion that permitted/required psychiatric care for inmates once per 90 days. Accordingly, Plaintiff's claim for the denial of constitutionally adequate psychiatric care will **PROCEED** against the Mental Health Treatment Team members and Centurion.

Finally, the Court considers Plaintiff's claim that he was denied "decent prison conditions" [*Id.* at 26]. The Court finds these allegations do not form a distinct claim; they are part and parcel of Plaintiff's claim that he has been denied appropriate psychiatric care. However, to the extent that Plaintiff intends to assert that he has a distinct right to a prison transfer to receive such care,

---

[2] If fact, it appears Plaintiff was in either in segregation, protective custody, or on suicide watch for almost all the events recited in his complaint [*See generally* Doc. 2].

the Court finds Plaintiff has no constitutional right to be housed at any particular facility. *See Olim v. Wakinekona*, 461 U.S. 238, 245–48 (1983); *see also McCord v. Maggio*, 910 F.2d 1248, 1250 (1990) (holding prisoner housing is a matter squarely within the "broad discretion" of prison officials, "free from judicial intervention" except in extreme circumstances). Accordingly, any such claim will be **DISMISSED**.

### III. CONCLUSION

For the reasons set forth above:

1. Plaintiff's motion for leave to proceed *in forma pauperis* [Doc. 1] is **GRANTED**;

2. Plaintiff is **ASSESSED** the civil filing fee of $350.00;

3. The custodian of Plaintiff's inmate trust accounts is **DIRECTED** to submit the filing fee to the Clerk in the manner set forth above;

4. The Clerk is **DIRECTED** to provide a copy of this Memorandum and Order and the accompanying Judgment Order to the custodian of inmate accounts at the institution where Plaintiff is now confined and the Court's financial deputy;

5. Plaintiff has set forth a plausible failure-to-protect and denial-of-psychiatric-care claims against Rust Cornett, Patrick Turner, Michelle Brewer, Tracina Cross, and Centurion, and these claims will **PROCEED**;

6. The Clerk is **DIRECTED** to send Plaintiff service packets (a blank summons and USM 285 form) for these Defendants;

7. Plaintiff is **ORDERED** to complete the service packets and return them to the Clerk's Office within twenty-one (21) days of entry of this Order;

8. At that time, the summonses will be signed and sealed by the Clerk and forwarded to the U.S. Marshal for service, *see* Fed. R. Civ. P. 4;

9. Plaintiff is **NOTIFIED** that if he fails to timely return the completed service packets, this action will be dismissed;

10. Defendants shall answer or otherwise respond to the complaint within twenty-one (21) days from the date of service. If any Defendant fails to timely respond to the complaint, it may result in entry of judgment by default against him or her;

11. All other claims and Defendants are hereby **DISMISSED**; and

12. Plaintiff is **ORDERED** to immediately inform the Court and Defendants or their counsel of record of any address changes in writing. Pursuant to Local Rule 83.13, it is the duty of a pro se party to promptly notify the Clerk and the other parties to the proceedings of any change in his address, to monitor the progress of the case, and to prosecute or defend the action diligently. E.D. Tenn. L.R. 83.13. Failure to provide a correct address to this Court within fourteen (14) days of any change in address may result in the dismissal of this action.

**SO ORDERED**.

**ENTER:**

s/Clifton L. Corker
UNITED STATES DISTRICT JUDGE